**Schedule 3**

*Definitions*

"**Administration**" has the meaning contained in paragraph 1.1.3 of the ISM Code.

"**Affiliate**" of any specified Person means any other Person directly or indirectly controlling or controlled by or under direct or indirect common control with such specified Person. For purposes of this definition, "control" when used with respect to any specified Person means the power to direct the management and policies of such Person, directly or indirectly, whether through the ownership of voting securities, by contract or otherwise, and the terms "controlling" and "controlled" have meanings correlative to the foregoing.

"**Agreed Classification**" means the classification equivalent to or better than the classification specified or described in the Classification Certificate referred to in Schedule 1 of the MOA, without any restriction on international trade and taking into account any change, alteration and/or modification of the rules or regulation of the Classification Society.

"**Annex VI**" means Annex VI (Regulations for the Prevention of Air Pollution from Ships) to the International Convention for the Prevention of Pollution from Ships 1973 (as modified in 1978 and 1997) (as the same may be amended from time to time) or any replacement of Annex VI.

"**Applicable Country**" means Hong Kong.

"**Applicable Law**" means any applicable federal, state, local, municipal, foreign or other law, including Environmental laws, statute, legislation, rule, regulation, treaty or court or administrative interpretation thereof and any applicable order or decree.

"**Appraisal**" means an appraisal to determine the Fair Market Value of the Vessel, performed separately by three Approved Appraisers at the Charterers' cost, with the Fair Market Value to be arrived at by taking the average of the three vessel values certified by such Appraisers.

"**Approved Appraiser**" means an Appraiser listed in Schedule 4 (*the Approved Appraisers*) as may be selected by the Owners, or such other independent Appraiser as may be acceptable to the Owners and the Banks.

"**Authorisation**" means an authorisation, consent, approval, resolution, licence, permit, exemption, filing or registration.

"**Authorised Person**" means (i) with respect to the Owners or an Obligor, any Person authorized by or pursuant to the organizational documents, the by-laws or any corporate authorization of that Obligor (whether general or specific) to execute, deliver and take all other actions on behalf of that Obligor in respect of any of the Transaction Documents to which it is a party and (ii) with respect to any other entity, any Person authorized by or pursuant to the charter documents, the by-laws documents or any Board Resolution (in the case of a corporation or limited liability company), partnership agreement (in the case of a partnership), or trust agreement (in the case of a trust) to execute, deliver and take all other actions on behalf of such entity in respect of the Transaction Documents.

"**Banks**" means any Swap Bank and any other bank or financial institution from time to time providing finance or otherwise any banking or hedging facilities in connection with or incidental to

the ownership of the Vessel by the Owners, or any representative or trustee of them.

"**Basic Hire**" means the Basic Hire payable throughout the Charter Period pursuant to and computed in accordance with Clause 11 of this Charter on the assumptions set out in Schedule 1.

"**Bills of Sale**" means the bills of sale of the Newbuilding Sellers and the Sellers in relation to the Vessel executed by the Newbuilding Sellers in favour of the Sellers and the Sellers in favour of the Owners respectively.

"**BLT**" means PT Berlian Laju Tanker Tbk, a company incorporated in the Republic of Indonesia and having its registered address at Wisma BSG Lt. 10, Jalan Abdul Muis No. 40, Jakarta 10160, Indonesia.

"**BLT Group**" means at any time BLT, its Subsidiaries and its Affiliates.

"**Board of Directors**" means, with respect to any Person, either the board of directors of such Person, the managing members of such Person or any duly authorized committee of said board or said managing members.

"**Business Day**" means any day other than a Saturday or Sunday or other day on which the banks in New York, Singapore, Jakarta or London are authorized or obligated to remain closed.

"**Builder's Certificate**" shall mean the builder's certificate in respect of the Vessel executed by the Shipyard in connection with the Shipbuilding Contract.

"**Charter**" means this bareboat charterparty between the Charterers and the Owners as the same may be amended, modified or supplemented from time to time in accordance with the provisions thereof.

"**Charter Guarantor**" means each of (i) PT Berlian Laju Tanker Tbk, a company incorporated in the Republic of Indonesia and having its registered address at Wisma BSG Lt. 10, Jalan Abdul Muis No. 40, Jakarta 10160, Indonesia and (ii) Gold Bridge Shipping Corporation, a company incorporated in the British Virgin Islands and having its registered address at PO Box 957, Offshore Incorporations Centre, Road Town Totola, British Virgin Islands.

"**Charter Guarantee**" means a joint and several guarantee and indemnity of the Charter Guarantors in favour of the Owners in such form as the Owners may agree or require.

"**Charter Period**" means the period beginning on the Charter Period Commencement Date and ending at 11.59 P.M. Singapore time on the date (i) falling on the fifth anniversary of the Charter Period Commencement Date, subject to Clause 2 of this Charter.

"**Charter Period Commencement Date**" means the Vessel Closing Date.

"**Charterers**" means Universal Grace Limited, a company incorporated under the laws of Hong Kong, together with its permitted successors and assigns.

"**Charterers' Assignment of Earnings**" means the first priority assignment of the earnings and charterparties in respect of the Vessel from any and all sources (excluding earnings under this Charter) to be executed by the Charterers in favor of the Owners as the same may be modified, amended or supplemented from time to time in accordance with the applicable provisions thereof.

"**Charterers' Assignment of Insurances**" means the first priority assignment of the insurances in

respect of the Vessel to be executed by the Charterers in favour of the Owners, as the same may be modified, amended or supplemented from time to time in accordance with the applicable provisions thereof substantially in the form set forth as required by the Owners.

"**Classification Society**" means one of the following classification societies:

(i)      American Bureau of Shipping (ABS);

(ii)     Bureau Veritas (BV);

(iii)    Det Norske Veritas (DNV);

(iv)    Nippon Kaiji Kyokai (NKK);

(v)     Germanischer Lloyd (GL); and

(vi)    Lloyd's Register of Shipping (LR).

"**Default**" means an event or condition which, with the giving of notice or lapse of time, or both, would constitute an Event of Default.

"**Documentary Closing**" means the execution of the Transaction Documents.

"**Documentary Closing Date**" means the date, which shall be a Business Day, on which the Documentary Closing occurs.

"**Dollars**" or the symbol "$" means the lawful currency of the United States of America.

"**EBITDA**" has the meaning ascribed to it in Clause 35.4(c).

"**Environment**" means all or any of the following media (alone or in combination):

(i)      any land including, without limitation, surface land and sub-surface strata, sea bed or river bed under any water (as defined below) and any natural or man-made structures;

(ii)     water including, without limitation, the high seas, territorial, coastal and inland waters, the marine environment, surface waters, ground waters and water in drains and sewers;

(iii)    air including, without limitation, air within buildings and other natural or man-made structures above or below the ground; and

(iv)    any living organism supported by those media including man and his property.

"**Environmental Claim**" means any written or oral notice or intimation from anyone, including, without limitation, any Governmental Entity, alleging any breach, contravention or violation of any Environmental Law or the existence of any liability or potential liability (i) arising from any such breach, contravention or violation, or (ii) otherwise resulting from or relating to damage or harm to the Environment including, without limitation, liability to conduct, pay for or for damages in respect of any investigation or audit, clean-up, remediation, administrative cost or charge or expense, damage to the Environment or any natural resource, property loss or damage, personal injury or any penalty attaching or relating to the presence, emission, release or leak of any Hazardous Material in or to the Environment.

"**Environmental Law**" means the Oil Pollution Act of 1990 of the United States of America, any

similar law of any other nation within whose waters or economic zone the Vessel is operated, any other Applicable Law (including any state or local laws and principles of common law and decisional law) relating to the environment or natural resources or regulating, controlling, prohibiting, or imposing liability with respect to water pollution, air pollution, noise, or the handling, storage or transportation of Hazardous Materials. The term "**law**" includes any treaty or international convention applicable to any waters within which the Vessel operates the subject of which is the transportation or Release of Hazardous Materials.

"**Environmental Permits**" means all or any permits, licences, consents, approvals, certificates, registrations, and other authorisations and the filing of all notifications, reports and assessments required under any Environmental Law for the operation of the Vessel or the carriage of cargo therein or otherwise applicable to the Vessel.

"**Event of Default**" means any of the events referred to in Clause 28 of this Charter.

"**Event of Loss**" means any of the following events occurring during the Charter Period or any extension of the Charter Period: (a) the actual or constructive total loss of the Vessel, (b) the destruction of the Vessel, (c) damage to the Vessel to an extent as shall make repair thereof uneconomical or shall render the Vessel permanently unfit for normal use (other than obsolescence), (d) the theft or disappearance of the Vessel, (e) the confiscation or seizure of, or requisition of title to, the Vessel, (f) requisition of use by any Governmental Entity (other than the requisition for use by the government of the Applicable Country) that shall not be revoked before the earlier to occur of 30 days and the end of the Charter Period, (g) the requisition for use of the Vessel by the government of the Applicable Country that shall not be revoked before the end of the Charter Period and (h) the deprivation of the possession and use of the Vessel for a continuous period of 180 days due to piracy or hijacking of the Vessel;.

"**Event of Loss Proceeds**" means the Insurance Proceeds, Requisition Compensation or any other amount by way of compensation, damages or similar payment, arising in each case in respect of an Event of Loss.

"**Equity Return**" means, in respect of the Shareholder's contribution of the Initial Equity to the Owners to part-enable the Owner to acquire the Vessel under the MOA, the net economic return expected by, or to be paid to, the Shareholder in respect of that contribution.

"**Facility Office**" means the office or offices notified by the Banks to the Owners and the Charterers in writing as the office or offices through which it will perform its obligations under a Loan Agreement.

"**Fair Market Value**" means the value of the Vessel as determined by an Appraisal to be made without, unless required by the Owner, physical inspection of the Vessel, and on the basis of a sale for prompt delivery for cash at arm's length on normal commercial terms as between a willing buyer and a willing seller without taking into account the benefit of any charterparty or other engagement concerning the Vessel.

"**Financial Indebtedness**" means any indebtedness for or in respect of:

(i)      moneys borrowed;

(ii)     any amount raised by acceptance under any acceptance credit facility;

(iii)    any amount raised pursuant to any note purchase facility or the issue of bonds, notes,

debentures, loan stock or any similar instrument;

(iv)   the amount of any liability in respect of any lease or hire purchase contract which would, in accordance with IFRS, be treated as a finance or capital lease;

(v)   receivables sold or discounted (other than any receivables to the extent they are sold on a non-recourse basis);

(vi)   any amount raised under any other transaction (including any forward sale or purchase agreement) having the commercial effect of a borrowing;

(vii)   any derivative instrument entered into in connection with protection against or benefit from fluctuation in any rate or price (and, when calculating the value of any derivative transaction, only the marked to market value shall be taken into account);

(viii)   shares which are expressed to be redeemable;

(ix)   any counter-indemnity obligation in respect of a guarantee, indemnity, bond, standby or documentary letter of credit or any other instrument issued by a bank or financial institution; and

(x)   the amount of any liability in respect of any guarantee or indemnity for any of the items referred to in paragraphs (i) to (ix) above.

"**Financing Documents**" means the Loan Agreement(s) and the Finance Documents (as defined in the Loan Agreement(s)).

"**Gold Bridge**" means Gold Bridge Shipping Corporation, a company incorporated in the British Virgin Islands and having its registered address at PO Box 957, Offshore Incorporations Centre, Road Town Totola, British Virgin Islands.

"**Governmental Entity**" means (i) any nation, kingdom, republic, confederation, principality, state, commonwealth, province, territory, canton, country, parish, city, town, township, municipality, village, hamlet, borough, district or other jurisdiction of any nature, (ii) any federal, state, local foreign or other government and (iii) any governmental or quasi-governmental authority of any nature (including any governmental division, subdivision, department, agency, ministry, service, system, corps, administration, bureau, branch, office, commission, council, board and any court or other tribunal).

"**Hazardous Material**" means any element or substance, whether natural or artificial, and whether consisting of gas, liquid, solid or vapour, whether on its own or in any combination with any other element or substance, which is capable of being or becoming harmful to mankind or any living organism or damaging to the Environment including without limitation oil (as defined in the United States Oil Pollution Act of 1990, as amended) and all hazardous substances (as defined in the United States Comprehensive Environmental Response, Compensation and Liability Act of 1980, as amended).

"**Hire**" means collectively Basic Hire and Supplemental Hire.

"**Hijacking**" means the hijacking, theft or disappearance of the Vessel, resulting in loss of possession by the operator.

"**Home Jurisdiction**" means, in relation to any person, the jurisdiction under the laws of which that person is constituted.

"**IAPPC**" means the International Air Pollution Prevention Certificate issued under Annex VI.

"**IFRS**" has the meaning ascribed to it in Clause 35.4(c).

"**Indigo Pacific**" means Indigo Pacific Corporation, a company incorporated in the British Virgin Islands and having its registered address at PO Box 362, Road Town, Totola, British Virgin Islands.

"**Initial Equity**" means the amount contributed or to be contributed by the Shareholder to the Owners (whether by way of equity or shareholder's loans or a combination of both) to assist the Owners' acquisition of the Vessel, comprising the difference between the Owners' Cost and the amount of the Loan advanced by the Banks.

"**Improvement**" means an improvement, structural change, modification or addition to the Vessel made after the Vessel Closing Date.

"**Indebtedness**" means the aggregate of the Loan Outstanding and all Swap Indebtedness.

"**Indemnitee**" means the Owners, the Shareholder, the Banks, their respective successors and permitted assigns, and their shareholders, affiliates, partners, contractors, officers, agents and employees.

"**Insurances**" means the insurance and reinsurance cover required to be maintained under this Charter.

"**Insurance Proceeds**" means the amounts that are payable as a consequence of a claim under the Insurances.

"**ISM Certificate**" means a certificate of compliance issued in accordance with Rule 13 of the ISM Code.

"**ISM Code**" means the International Safety Management Code for the Safe Operating of Ships and for Pollution Prevention constituted pursuant to Resolution A.741(18) of the International Maritime Organization and incorporated into the Safety of Life at Sea Convention and shall include any amendments or extensions thereto and any regulation issued pursuant thereto.

"**ISPS Code**" means the International Ship and Port Facility Code for the security of ships and of port facilities adopted by the International Maritime Organisation on 12 December 2002 pursuant to Conference Resolution 2 and includes any amendment or extensions thereto, any replacement thereof and any regulation issued pursuant thereto.

"**ISSC**" means a valid certificate issued by the Administration or organisation recognised by the Administration and referred to in paragraph 19.2.1 of the ISPS Code.

"**Late Rate**" means as at any time, a rate of interest per annum specified in Box 24 of the Charter.

"**Lien**" means any mortgage, charge, assignment, pledge, lien, or other security interest securing any obligation of any person or any other agreement or arrangement having a similar effect.

"**Loan**" means the aggregate amount up to $39,000,000 advanced or to be advanced by the Banks to the Owners, as borrower pursuant to the Loan Agreement(s).

"**Loan Outstanding**" means at any time, the principal amount outstanding in respect of the Loan.

"**Loan Agreement**" means any loan agreement made or to be made by *inter alia* the Owners and one or more Banks to part finance the Owners' acquisition of the Vessel under the MOA, as may be further amended from time to time, a copy of which the Charterers confirm that they have received and have familiarised themselves with.

"**Loan Event of Default**" has the meaning ascribed to "Event of Default" in each Loan Agreement.

"**Losses**" includes all losses (including loss of profit), payments, damages, liabilities, claims, proceedings, actions, penalties, fines, duties, fees, rates, levies, charges, demands, royalties or other liabilities of a monetary nature, fees, insurance premiums, calls, judgments, costs and expenses (other than Taxes).

"**Loss Payable Clause**" means the loss payable clause in respect of the insurances assigned to the Owners by the Charterers under the Assignment of Insurances, in the format substantially as provided in the Assignment of Insurances or such form as may be acceptable to the Banks.

"**Major Casualty Threshold**" means $1,000,000.

"**Manager**" means the Charterers or such other Person (with the prior written consent of the Owners, which consent shall not be unreasonably withheld) appointed by the Charterers.

"**Manager's Undertaking**" means any manager's undertaking required from time to time by a Mortgagee, substantially in the form set out in Schedule 5 or otherwise as supplied or agreed by the Owners.

"**Material Adverse Effect**" means a material adverse effect on the business, assets or financial condition of the Charterers or any Charter Guarantor which, in the Owners' opinion, may affect its ability to perform its obligations under the Transaction Documents.

"**Material Subsidiary**" means a Subsidiary of BLT, whose EBITDA (unconsolidated where that Subsidiary itself has Subsidiaries) as at the date at which its latest audited consolidated financial statements were prepared or, as the case may be, for the financial period to which those financial statements relate, account for 5 per cent. or more of the consolidated EBITDA of the BLT Group (all as calculated by reference to the latest audited consolidated financial statements of the BLT Group).

"**MOA**" means the acquisition agreement made between the Sellers and the Owners in respect of the conveyance of the Vessel by the Sellers to the Owners, dated on or about the date of this Charter.

"**Mortgages**" means the collective reference to the mortgages from time to time made by the Owners in favour of one or more of the Banks, their agent, or their security trustee for this purpose.

"**Mortgagee**" means any Person to whom the Vessel is mortgaged under a Mortgage.

"**Newbuilding Sellers**" means Clio Marine Inc..

"**Notice of Mortgage**" means, in relation to any Mortgage by the Owners, a notice of that Mortgage in the form supplied by the Owners to the Charterers, substantially as follows:

"This Vessel is subject to a First Priority Mortgage in favour of DVB Group Merchant Bank (Asia) Ltd. under the authority of the laws of Hong Kong.  Under the terms of the said

Mortgage neither the Owners, nor the Master, nor any officer or agent of this Vessel nor any other person has any right, power or authority to create, incur or permit to be imposed upon this Vessel, any liens whatsoever other than liens for crew's wages, collision or salvage."

"**Obligors**" means the Charterers and each Charter Guarantor.

"**Opinion of Counsel**" means a written opinion of counsel, which opinion and counsel shall be acceptable to such Person(s) to whom such opinion is to be addressed.

"**Original Financial Statements**" means the audited financial statements of the Charterers first delivered under this Agreement and of each Charter Guarantor for the financial year ended 2009, consolidated in the case of each Charter Guarantor.

"**Owners' Cost**" means the amount listed as the purchase price under Clause 2 of the MOA.

"**Owners' Liens**" means any Liens against the Vessel or any Part thereof that result from acts of, or any failure to act by, or as a result of claims (including any Taxes) against, the Owners arising out of any event or condition whether related or unrelated to (x) the ownership of the Vessel or (y) the transactions contemplated by the Transaction Documents.

"**Part**" means all appliances, parts, instruments, appurtenances, furnishings and other equipment which are from time to time incorporated or installed in or attached to the Vessel or which have been removed therefrom, but where title to which remains vested in the Owners in accordance with Clause 10 of the Charter.

"**Payment Date**" means the Charter Period Commencement Date and thereafter the first day of each month of each year occurring during the Charter Period, provided that if any such date shall not be a Business Day, then "**Payment Date**" means the next succeeding Business Day.

"**Permitted Liens**" means (a) any Lien created by or pursuant to the Transaction Documents; (b) any Lien for taxes of any kind either not yet assessed or, if assessed, not yet due and payable or being contested in good faith by appropriate proceedings (and for payment of which adequate reserves have been provided); (c) any lien on the Vessel for crew's wages or salvage or any other Lien otherwise arising in the normal course of trading or by operation of law in respect of obligations which are not overdue or which are being contested in good faith by appropriate proceedings (and for the payment of which adequate reserves have been provided or which are covered by liability or other insurance or by an indemnity from a third party) and the aggregate amount of which at any time, shall not exceed (together with paragraph (d) below) the Major Casualty Threshold; and (d) any Lien arising out of claims, judgments or awards against the Charterers which are being contested in good faith or which are the subject of a pending appeal and for which there shall have been granted a stay of execution pending such appeal and for the payment of which adequate reserves have been provided or which are covered by liability or other insurance or by an indemnity from a third party) and the aggregate amount of which at any time shall not exceed (together with paragraph (c) above) the Major Casualty Threshold.

"**Permitted Subcharter**" means any time, voyage or other subcharter of the Vessel that fulfills the following conditions:

(i)      the Owners have given its consent to such subcharter of the Vessel;

(ii)     such subcharter is made subject and subordinate to this Charter; and

(iii)     the Charterers will not be relieved of any liabilities under this Charter.

"**Permitted Subcharterer**" means any subcharterer under a Permitted Subcharter.

"**Person**" means any individual, corporation, partnership, joint venture, association, joint-stock company, trust, unincorporated organization or government or any agency or political subdivision thereof.

"**Protocol of Delivery and Acceptance**" means:

(i)     the protocol of delivery and acceptance in respect of the Vessel and executed by the Sellers in favour of the Owners in connection with the MOA, evidencing the passing of title from the Sellers to the Owners; or

(ii)     the protocol of delivery and acceptance in respect of the bareboat charter of the Vessel, evidencing the charter of the Vessel from the Owners to the Charterers in connection with this Charter,

and "**Protocols of Delivery and Acceptance**" means all of them.

"**Redelivery Date**" means the date upon which the Vessel is redelivered to the Owners by the Charterers pursuant to the terms of this Charter.

"**Requisition Compensation**" means all moneys or other compensation payable to the Charterers by reason of requisition for title or other compulsory acquisition of the Vessel otherwise than by requisition for hire.

"**Release**" means any disposal, emission, spill, release or discharge into or upon ambient air, surface water, ground water, land surface or subsurface strata, navigable waters, waters of the contiguous zone, ocean waters and international waters.

"**Safety Management Certificate**" means a valid certificate issued by the Administration or organisation recognised by the Administration and referred to in paragraph 13.7 of the ISM Code.

"**Safety Management System**" means a safety management system which has been developed and implemented in accordance with the ISM Code and which includes the functional requirements, duties and obligations required by the ISM Code.

"**Sellers**" means the Charterers, in their capacity as sellers of the Vessel under the MOA.

"**Shareholder**" means Searchlight Holding Inc., a company incorporated under the laws of the Marshall Islands.

"**Shipbuilding Contract**" means the contract for construction and sale of one (1) 25,100 DWT Chemical Tanker (Hull No. 5710) dated 30 January 2008 between Clio Marine Inc. and Lenani Maritime Inc., as nominated to the Charterers under a nomination letter dated 7 October 2010.

"**Shipping Register**" means the registry of ships of Hong Kong.

"**Shipyard**" means Shin Kurushima Dockyard Co., Ltd..

"**Stipulated Loss Value**" means, as of any Stipulated Loss Value Determination Date, an amount as shown in Schedule 2 opposite such Stipulated Loss Value Determination Date.

"**Stipulated Loss Value Determination Date**" means each of the dates set forth on Schedule 2 to

this Charter.

"**Subsidiary**" means a subsidiary within the meaning of Section 1159(1) of the Companies Act 2006.

"**Supplemental Hire**" means any and all amounts (other than Basic Hire) that the Charterers assumes the obligation to pay or agrees to pay under the Transaction Documents to the Owners or others, including amounts payable as indemnity payments (including but not limited to payments under Clauses 17 and 36 of this Charter), payment(s) of Stipulated Loss Value and purchase price under this Charter, and all amounts (other than Basic Hire) payable by the Charterers pursuant to this Charter.

"**Swap Bank**" means any bank or financial institution from time to time entering into a Swap Contract with the Owners.

"**Swap Contract**" means any derivative transaction that may be entered into by the Owners with one or more Swap Banks to hedge its interest rate risks under the Loan Agreement(s) for the duration of the Charter Period.

"**Swap Indebtedness**" means, in relation to a Swap Contract on any date, the amount certified by the Owners to be payable by the Owners to the relevant Swap Bank(s), were that Swap Contract unwound or terminated on that date.

"**Tax**" (and, with correlative meaning, "**Taxes**") means any federal, state, local or foreign income, value added, excise, alternative or add-on minimum, business, employment, franchise, occupancy, payroll, property, sales, transfer, use, withholding or other tax, levy, impost, fee, imposition, assessment or similar charge, together with any related addition to tax, interest, penalty or fine thereon except for taxes on or measured by the overall net income of the Owners imposed by any Governmental Entity, subdivision or taxing authority of any thereof or by any other taxing authority having jurisdiction over the Owners.

"**Tax Credit**" means a credit against, relief or remission for, or repayment of any Tax.

"**Tax Deduction**" means a deduction or withholding from a payment under an Transaction Document for or on account of Tax.

"**Tax Payment**" means an increased payment made by the Charterers to the Owners or the Banks under Clause 36.1 (Tax Gross-Up) or a payment under Clause 36.2 (Tax Indemnity).

"**Tax Residence**" means, in relation to any person, the jurisdiction in which that person is principally resident for the purposes of paying Tax in relation to its capital or income, but, in relation to the Owners or the Banks, does not include any jurisdiction in which the Owners or the Banks (as the case may be) is resident for the purposes of paying Tax in relation to its capital or income only because:

(a)     it has entered into the transactions contemplated by the Transaction Documents; or

(b)     the Charterers have been negligent or has wilfully defaulted in its obligations.

"**Transaction Documents**" means the MOA, the Builder's Certificate, the Bills of Sale, this Charter, the Charterers' Assignment of Insurances, the Charter Guarantee, the Charterers'

Assignment of Earnings and the Financing Documents.

"**United States**" means the United States of America, including the states thereof and the District of Columbia.

"**Unwinding Losses**" means Losses in respect of:

(i)    the unwinding or other termination of:

    (a)    any Loan Agreement and the documents executed by the Owners thereunder including (without limitation) the acceleration of the Loan Outstanding;

    (b)    the Transaction Documents and any documents collateral or incidental thereto;

    (c)    any swap agreement or similar hedging instruments which may from time to time be entered into by the Owners with any swap bank whereby the Owners may seek to hedge, limit or offset any part of its exposures under any of the Transaction Documents;

    (d)    the transactions contemplated by paragraphs (a) to (c) above;

(ii)   the winding up or liquidation of the Owners.

"**Vessel Assets**" means the Vessel, the Vessel Proceeds or any interest in them or in the Transaction Documents.

"**Vessel Closing**" means the delivery of the Vessel by the Newbuilding Sellers and the Sellers collectively to and acceptance by or on behalf of the Owners pursuant to the Shipbuilding Contract and the MOA and the delivery of the Vessel by the Owners to and acceptance by the Charterers as provided in Clause 3 of this Charter.

"**Vessel Closing Date**" means the date, which shall be a Business Day, on which the Vessel Closing occurs.

"**Vessel Proceeds**" means any Insurance Proceeds, any Requisition Compensation, any Event of Loss Proceeds and any other amounts that are due by way of compensation, damages or similar payment in respect of any loss of or damage to the Vessel.

**Schedule 4**

*The Approved Appraisers*

1.    Compass Maritime Services LLC

2.    Joachim Grieg & Co.

3.    Simpson Spence & Young Ltd

4.    Fearnleys AS

5.    Maritime Strategies International Ltd


If, at any time during the Charter Period, any of the above Appraisers cease to exist, the Owners and Charterers agree to substitute that Appraiser with a new Appraiser acceptable to the Owners and the Charterers.

**Schedule 5**

*Form of Manager's Undertaking*

To:     **[Mortgagee] (the "Agent")**

        [Address]


From:   **[Manager]**

        [Address]


[Date]


Dear Sirs

**m.t. "Wilutama" (the "Vessel")**

**1      BACKGROUND**

1.1     <u>Entry into Loan Agreement</u>.  We refer to [*insert details of loan agreement*] (the "**Loan Agreement**").

1.2     <u>Bareboat Charter</u>.  Subject to and upon the terms of a bareboat charterparty dated as of _____ 20____ in relation to the Vessel (the "**Bareboat Charter**") and made between the Owners and [              ] / [                    ] (the "**Bareboat Charterers**"), the Owners have agreed to bareboat charter, and the Bareboat Charterers have agreed to take on hire, the Vessel.

**2      INTERPRETATION**

2.1     Defined expressions.  Words and expressions defined in the Loan Agreement shall have the same meanings when used in this Letter of Undertaking unless the context otherwise requires.

**3      CONFIRMATION OF APPOINTMENT, ETC.**

3.1     <u>Confirmation of appointment</u>.  We confirm that we have been appointed by the Bareboat Charterers as the manager of the Vessel on the terms of a Management Agreement dated _____ (the "**Management Agreement**") a copy of which is attached to this Letter of Undertaking.

3.2     <u>Certification</u>.  We certify that the attached Management Agreement is a true and complete copy of such document and that no addenda or supplements to it exist as at the date of this Letter of Undertaking.

**4      UNDERTAKINGS**

4.1     <u>Undertakings</u>.  In consideration of [the Agent] granting its approval to our appointment as manager of the Vessel, we irrevocably and unconditionally undertake with [the Agent] as follows:

(a)     that all claims of whatsoever nature which we have or may at any time after the date of this

Letter of Undertaking have against or in connection with the Vessel, its earnings, insurances or requisition compensation or against the Owners or the Bareboat Charterers shall rank after and be in all respects subordinate to all of the rights and claims of [all the Finance Parties];

(b)     that we shall not take any step to exercise or enforce any right or remedy which we now or at any later time have under any applicable law against the Owners or the Bareboat Charterers or the Vessel, its earnings, insurances or requisition compensation;

(c)     that we shall not institute any legal or administration action or any quasi-legal proceedings under any applicable law at any time after the date of this Letter of Undertaking against the Vessel, its earnings, insurances or requisition compensation or against the Owners in any capacity;

(d)     that we shall not compete with any of the Finance Parties in a liquidation or other winding-up or bankruptcy of the Owners or the Bareboat Charterers or in any legal or administration action or any quasi legal proceedings in connection with the Vessel, its earnings, insurances or requisition compensation;

(e)     that we shall upon [the Agent's] first written request deliver to [the Agent] all documents of whatever nature which we hold in connection with the Owners, the Bareboat Charterers, the Vessel, its earnings, insurances and requisition compensation;

(f)     that we shall not enter into any addendum or supplement to the Management Agreement without [the Agent's] prior written consent;

(g)     that we shall continue to act as manager of the Vessel pursuant to the terms and conditions of the Management Agreement for as long as the Vessel remains in the ownership of the Owners, remains subject to the Bareboat Charter and any Secured Liabilities remain outstanding pursuant to the Finance Documents; and

(h)     that we shall not do or omit to do or cause anything to be done or omitted which might be contrary to or incompatible with the obligations undertaken by the Owners or the Bareboat Charterers under the Loan Agreement and the Finance Documents.

**5        GOVERNING LAW AND JURISDICTION**

5.1     **English law**.  This Letter of Undertaking and any non-contractual undertakings arising out of or in connection with it shall be governed by and construed in accordance with English law.

5.2     **Exclusive English jurisdiction**.  Subject to Clause 5.3 below, the courts of England and Wales shall have exclusive jurisdiction in relation to all matters which may arise out of or in connection with this Letter of Undertaking.

5.3     **Choice of forum for the benefit of the Agent**.  Clause 5.2 is for the exclusive benefit of [the Agent], which reserves the right:

(a)     to commence proceedings in relation to any matter which arises out of or in connection with this Letter of Undertaking in the courts of any country other than England and Wales and which have or claim jurisdiction to that matter; and

(b)     to commence proceedings in the courts of any country or countries concurrently with or in addition to proceedings in England and Wales or without commencing proceedings in England and

Wales.

We shall not commence any proceedings in any country other than England and Wales in relation to a matter which arises out of or in connection with this Letter of Undertaking.

[5.4    **Process Agent**.  We irrevocably appoint [*name of process agent*] at its registered office for the time being (presently at [address of process agent]) to act as our agent to receive and accept on our behalf any process or other document relating to any proceedings in England and Wales courts which are connected with this Letter of Undertaking.]

5.5    **Agent's rights unaffected**.  Nothing in this Clause 5 shall exclude or limit any right which the Agent may have (whether under the law of any country, an international convention or otherwise) with regard to the bringing of proceedings, the service of process, the recognition or enforcement of a judgment or any similar or related matter in any jurisdiction.

5.6    **Meaning of "proceedings"**.  In this paragraph "**proceedings**" means proceedings of any kind, including an application for a provisional or protective measure.

**Executed as a Deed**

_____

Director / Attorney-in-fact / Authorised Signatory

Name:

For and on behalf of

[Manager]

**Schedule 6**

*Conditions Precedent and Conditions Subsequent*

1. **Conditions Precedent**

   The Owners must receive the following prior to the Charter Period Commencement Date in form and substance satisfactory to it:

1.1 Evidence of Corporate Authority

   1.1.1 Sellers

   (i)     A copy of the Sellers' certificate of incorporation and other constitutional documents, certified to be true, complete and up to date by a duly authorised officer of the Sellers;

   (ii)    Copies of resolutions of the Sellers' board of directors and shareholders authorising the Sellers to enter into and perform each of the Transaction Documents to which it is a party and the transactions contemplated by them, certified to be true, complete and up to date by a duly authorised officer of the Sellers;

   (iii)   A certificate of a duly authorised officer of the Sellers setting out the names and signatures of the individuals authorised to sign each of the Transaction Documents to which it is a party and any related notice or document; and

   (iv)    Two original powers of attorney of the Sellers, in form acceptable by the Hong Kong authorities or the Shipping Register and duly notarized and legalized as required by the Hong Kong authorities or as required by the Shipping Register.

   1.1.2 Charterers

   (i)     A copy of the Charterers' articles of incorporation and other constitutional documents, certified to be true, complete and up to date by a duly authorised officer of the Charterers;

   (ii)    Copies of resolutions of the Charterers' board of directors and shareholders authorising the Charterers to enter into and perform each of the Transaction Documents to which it is a party and the transactions contemplated by them, certified to be true, complete and up to date by a duly authorised officer of the Charterers;

   (iii)   A certificate of a duly authorised officer of the Charterers setting out the names and signatures of the individuals authorised to sign each of the Transaction Documents to which it is a party and any related notice or document; and

   (iv)    Two original powers of attorney of the Charterers.

   1.1.3 Charter Guarantors

   (i)     A certified copy of the constitutive documents of each Charter Guarantor.

   (ii)    A copy, certified true by an authorised officer of each Charter Guarantor as being

in full force and effect on the date thereof, of:

(a)   all actions required to be taken by that Charter Guarantor (A) authorising the entry into of the Transaction Documents to which it is a party and (B) authorising appropriate persons to execute and deliver the Transaction Documents to which it is a party on behalf of that Charter Guarantor and to take any action contemplated in the Transaction Documents to which it is a party; and

(b)   all necessary consents required by that Charter Guarantor for the execution, delivery and performance of the Transaction Documents to which it is a party or, if no such consents are necessary, a certificate to that effect from a person duly authorised by that Charter Guarantor so to certify.

(iii)   Specimen signatures of the respective persons referred to in paragraph 1.1.3(ii)(b) above, duly certified by an authorised officer of the Owners, together with certificates of incumbency, also duly certified, in respect of each such person.

(iv)   Two original powers of attorney of each Charter Guarantor, notarised.

1.2   <u>Evidence of Owners' Title and Delivery to Charterers</u>

1.2.1   Original Bill of Sale in the form prescribed by the Shipping Register warranting that the Vessel is free from all encumbrances, mortgages and maritime liens or any other debts or claims whatsoever, duly executed by the Sellers in favour of the Owners, and duly notarised and legalised by the Hong Kong authorities or as required by the Shipping Register.

1.2.2   Original Builder's Certificate issued by the Shipyard in favour of the Sellers, in a form acceptable to the Shipping Register together with such other documentation as the Shipping Register shall require to enable the Vessel to be registered with the Shipping Register in the name of the Owners, duly notarised and legalised if required by the Shipping Register.

1.2.3   Original Bill of Sale from the Newbuilding Sellers to the Sellers, in form acceptable to the Shipping Register together with such other documentation as the Shipping Register shall require to enable the Vessel to be registered with the Shipping Register in the name of the Owners, duly notarised and legalised if required by the Shipping Register.

1.2.4   Original Power of Attorney of the Newbuilding Sellers, authorising the execution by a signatory of the Newbuilding Sellers of all necessary documentation pursuant to the Shipbuilding Contract in order to effect the sale and transfer of the Vessel to the Sellers and to effect delivery of the Vessel to the Sellers, in form acceptable to the Shipping Register and duly notarised and legalised as required by the Shipping Register.

1.2.6   Original Protocol of Delivery and Acceptance between the Newbuilding Sellers and the Sellers under the Shipbuilding Contract.

1.2.7   Original Protocol of Delivery and Acceptance between the Sellers and the Owners

under the MOA.

1.2.7    Original Protocol of Delivery and Acceptance between the Owners and the Charterers under this Charter.

1.3    Shipping Register

1.3.1    Evidence satisfactory to the Owners that there are no dues, taxes or amounts owed to the Shipping Register in respect of the Vessel.

1.3.2    Any such additional documents as may reasonably be required by the competent authorities for the purpose of registering the Vessel under the laws and flag of the Shipping Register, provided the Owners notifies the Sellers of any such documents as soon as possible after the date of this Charter.

1.4    Classification, Technical

1.4.1    All class and trading certificates and other documents in connection with the delivery of the Vessel from the Newbuilding Sellers to the Sellers under the Shipbuilding Contract, the delivery of the Vessel from the Sellers to the Owners under the MOA and the delivery of the Vessel from the Owners to the Charterers under this Charter including, but not limited to:

(i)       Classification Certificate;

(ii)      Safety Construction Certificate;

(iii)     Safety Equipment Certificate;

(iv)      Safety Radio Equipment Certificate;

(v)       Load Line Certificate;

(vi)      International Tonnage Certificate;

(vii)     Document of Compliance of the Sellers or the manager of the Vessel;

(viii)    ISM Certificate of the Sellers or the manager of the Vessel;

(ix)      International Ship Security Certificate;

(x)       International Air Pollution Prevention Certificate;

(xi)      Safety Management Certificate;

(xii)     Protocol of Inventory;

(xiii)    Protocol of Trials;

(xiv)     Protocol of Stores of Consumable Nature;

(xv)      Declaration of Warranty;

(xvi)     Drawings and plans which will remain on board;

(xvii)    All other delivery documents from the Sellers to the Owners; and

(xviii)   Any other documents delivered by the Newbuilding Sellers or the Sellers.

1.5     Evidence of Purchase Price

1.5.1   Original commercial invoice from the Sellers, evidencing the Purchase Price.

1.6     Transaction Documents

    1.6.1   Originals of each of the Transaction Documents duly executed by the parties thereto. This Charter shall be notarized and/or legalized, if required, in a manner required by the Shipping Register.

1.7     Insurances

    1.7.1   Written evidence that the Insurances required by this Charter in respect of the Vessel are in full force and effect, including:

        (i)     confirmation from the manager of the applicable P&I Club as to the entry of the Vessel into that club;

        (ii)    confirmation from the relevant insurance brokers that the indemnity, hull, machinery and war risk insurance cover for the Vessel is in full force and effect and that premiums, calls or contributions in respect of the Insurance are not overdue;

        (iii)   copies of the Brokers letter of undertaking referred to in Clause 35.5(f) (Brokers' Undertakings); and

        (iv)    a report from an independent firm of marine insurance brokers with respect to the adequacy of the Insurances in effect with respect to the Vessel.

1.8     Legal opinions

    1.8.1   an agreed form opinion of Mochtar, Karuwin Komar, Indonesian legal counsel to the Owners and the Banks, in form and substance satisfactory to the Owners and the Banks; and

    1.8.2   an agreed form opinion of Harney Westwood & Riegels, British Virgin Islands legal counsel to the Owners and the Banks, in form and substance satisfactory to the Owners and the Banks.

1.9     Miscellaneous

    1.9.1   Evidence of the appointment and acceptance of the process agent in England and Wales for (i) each Charter Guarantor; (ii) the Charterers and (iii) the Owners.

    1.9.2   No Event of Default has occurred on or prior to the Charter Period Commencement Date under this Charter.

    1.9.3   Each of the representations and warranties contained in Clause 34.1 (Charterers' Representations and Warranties) given by the Obligors on the Charter Period Commencement Date are true and accurate.

    1.9.4   No change has occurred after the date of this Charter and before or on the Charter Period Commencement Date in any Applicable Law or in its interpretation which would make it illegal for any of the Owners and/or the Charterers to perform its

obligations under any of the Transaction Documents.

1.9.5 A copy of any other Authorisation or other document, opinion or assurance which the Owners considers to be necessary or desirable (if it has notified the Charterers accordingly) in connection with the entry into and performance of the transactions contemplated by any Transaction Document or for the validity and enforceability of any Transaction Document.

1.9.6 An Appraisal (at the Charterers' cost) by an Appraiser acceptable to the Owners, addressed to the Owners and dated no earlier than 14 days prior to the Charter Period Commencement Date.

1.9.7 Certified copies of the Original Financial Statements of each Charter Guarantor.

1.9.8 Any acknowledgements and in such form as may be required by the Mortgagee under Clause 12(b).

2. **Conditions Subsequent**

As soon as possible after the Delivery Date:

2.1.1 a copy of any other Authorisation or other document, opinion or assurance which the Owners considers to be necessary or desirable (if it has notified the Charterers accordingly) in connection with the entry into and performance of the transactions contemplated by any Transaction Document or for the validity and enforceability of any Transaction Document, unless the same has already been delivered under paragraph 1.9.5 above;

2.1.2 the issued opinion of Mochtar, Karuwin Komar, Indonesian legal counsel to the Owners and the Banks, in form and substance satisfactory to the Owners and the Banks;

2.1.3 the issued opinion of Harney Westwood & Riegels, British Virgin Islands legal counsel to the Owners and the Banks, in form and substance satisfactory to the Owners and the Banks; and

2.1.4 copies of all filings necessary or desirable in England and Wales, Indonesia, Hong Kong and British Virgin Islands in respect of the Transaction Documents.

**Schedule 7**

*Form of Compliance Certificate*

To:          Lantern Maritime Company

From:       PT Berlian Laju Tanker Tbk

Dated:

Dear Sirs

**"Wilutama"**

**Bareboat Charter dated [_____] (the "Charter")**

1.      We refer to the Charter. This is a Compliance Certificate. Terms defined in the Charter have the same meaning when used in this Compliance Certificate unless given a different meaning in this Compliance Certificate.

2.      Under Clause 35.4 (*Financial Covenants*) of the Charter, we are required to ensure that we maintain:

    (A)     a ratio of Net Debt to total shareholder's equity of no more than 2.5 : 1;

    (B)     a ratio of EBITDA to Debt Service of no less than 1 : 1 calculated on a trailing four quarter basis; and

    (C)     free and available cash or cash equivalents in an amount at least equal or greater than the higher of fifty million Dollars ($50,000,000) and four per cent. (4%) of the Interest Bearing Debt Liabilities.

3.      We confirm that:

    (A)     [The ratio of Net Debt to total shareholder's equity on [            ] is [            ] to 1;

    (B)     The ratio of our EBITDA to Debt Service calculated on [            ] on a trailing four quarter basis is no less than [    ]:1; and

    (C)     The free and available cash or cash equivalents is [        ] and [  ] of the Interest Bearing Debt Liabilities.

    The calculations for the above are as enclosed in Annex A below:]

4.      [We confirm that the requirements of Clause 35.4 (*Financial Covenants*) are complied with.]

5.      [We confirm that no Default is continuing.***]

---

***    *If this statement cannot be made, the certificate should identify any Default that is continuing and the steps, if any, being taken to remedy it.*

**Annex A**

*(Compliance Calculations}*

[Here annex the calculations for the financial covenants under paragraph 3]

Signed:

Director / Authorised Signatory

of

PT Berlian Laju Tanker Tbk

Director / Authorised Signatory

of

PT Berlian Laju Tanker Tbk